We have five cases on the calendar this morning, only one patent case, a trade dress case from the ITC, two government contract cases, one from the Armed Systems Board, one from the Federal Claims, and a government employee case that's been submitted on the briefs and will not be argued. The first case is SRI International v. Cisco Systems, 2017-22-23, Mr. Lee. Thank you, Your Honor. May it please the Court, my name is Bill Lee, and together with my partner, Andrew Danfort, I represent Cisco. Given the limits of time, I would like to focus on two issues today, but I'm happy to address any issues the Court would like us to. First I would like to focus on the District Court's error in ruling that the asserted claims are directed to patent-eligible subject matter under Section 101. And second, the District Court's erroneous claim construction, we contend, of the term based on analysis of network traffic data under the correct claim construction, we contend that judgment should have been entered for Cisco. So with the panel's permission, let me turn immediately to the Section 101 issue and take the two steps of Alice in order. Under Step 1 of Alice, the asserted claims are directed to an abstract idea, collecting, analyzing, and reporting data. The claims are broad, they are general, and they are generic. But the detecting paragraph, which really is a paragraph, has a lot of detail in it. Doesn't that rescue them? No, Your Honor. First, the claims themselves are general. The paragraph that identifies the type of information that you might consider to monitor the network is not sufficient to save them. It, in fact, is very much like the information that was in the claims in this Court's electric power decision. And that information, the record is clear. The inventors here did not identify those categories of information. They did not suggest there was anything novel about those categories. They were not the first to suggest that those categories be monitored for the purposes of identifying suspicious activity. They were simply the categories you would consider in taking this abstract idea and applying it to, in this context. One of the... Why isn't this really DDR Holdings? I mean, it's a computer-based problem. Your hypothetical seems so off-base, I mean... Your Honor, it's not, and I can actually give two answers to the question. DDR Holdings had two essential elements to the holding. The first was that it was solving a problem unique to computers and unique to the Internet, which is hyper-clicking and basically going to a new website. The asserted claims here don't solve a problem that is unique to computers. And in fact, the argument that was made to the jury by SRI is the best example. SRI argued that this hierarchical monitoring is old, has been applied before in computers and elsewhere. And they gave a specific example, which we've cited to you, I think at page 33 of our brief. But it's an example of bank guards in different banks who might monitor a suspicious activity, who might then write reports, they would go to a supervisor, a supervisor would integrate them and provide them. That is precisely what the claims describe. Your Honor, I gave you the incorrect page, it's page 28. But this is the example that SRI gave to the jury and demonstrates that it's not solving a problem unique to computers, and that was DDR. Well, they were trying to explain sort of for the jury to understand that what you're trying to do is look for suspicious activity and then add it up. But the difference is, is that when you're talking about bank guards, you're not able to detect specific activity from across the city or across the country. Actually, Your Honor, you could, because if you had the bank guards at different locations and the bank guards watch for suspicious activity, it could be new traffic coming to the bank, it could be people take the extreme walking with ski masks on, sending the reports to the jury. That is hierarchical monitoring. And this is not an argument that was just made once, Your Honor. If you look at A2934 to 2935, this is the closing argument that SRI made to the jury. And what they said is, I think, best demonstration that these claims are very general and very generic, they said, what kind of software you need doesn't matter. What kind of hardware you need doesn't matter. What does it have to do to collect the data doesn't matter. They're right. That is how general the claims are. And I think, Your Honor, the second half of my answer would be this. The end result of DDR was to come up with a new webpage that basically addressed the problem of the hyperlink or clicking on one site and going to another. There is no new webpage or nothing analogous here. So I think if I were to line the cases up as best I can, this case is much closer to electric power and fair warning. It's very close to electric power and the claims are almost identical in terms of this additional information. Where in the record do you have an admission that it's not novel to detect based on the packets identified in the detecting step? So Your Honor, two places, both at A1553, the first is line 17 to 23, the inventors concede that they did not invent the categories of network traffic data to be analyzed described in the claim. Oh, so you're saying they admitted that previously that very data had been analyzed in order to detect suspicious network activity? Yes. And then, Your Honor, if you go down a little bit further on that page, 1553 lines 24 to 1554 line 2, they have said earlier on the page that they weren't the first to identify these categories of information. They then say further on that they were not the first to monitor those categories of information. Right, but that doesn't have anything to do with whether they were the first to monitor in this fashion. No, Your Honor, but I think it goes to Judge Lurie's question at the outset, which is that the categories of information which I understood Judge Stoll to be referring to now are the same categories that Judge Lurie referred to at the outset. And those are the only categories that add any additional words to the claims. And what the record, I think, says in an undisputed fashion, because it comes right from the inventors, is hierarchical monitoring was known outside of the context of computers. Hierarchical monitoring was known in the context of computers. Monitoring these categories of information were known. And monitoring these categories of information in computers was known. That is why, Your Honor, if you look at that patent, and you look at the file history, you will search forever to find a suggestion that the identification of those categories was what made these claims novel, patentable, and provided patentable subject matter. One of the things I'm struggling with is the anticipation issue, which I realize is different as it should be. But a lot of what you're saying today sounds like an anticipation argument or an obviousness argument, and yet we've got an anticipation issue where the claim was found not to be anticipated, and it was this particular limitation that seems to be the thing that was missing from that prior argument. Your Honor, I think the questions of novelty and patentable subject matter are distinct, as the Court has said repeatedly. But they overlap to some degree. I mean, the second step of Alice, which I'll turn to immediately, clearly overlaps to some degree with the question of novelty or obviousness. But that's not the question here. And again, I would bring the Court to, at the panel decision, electric power, where in electric power, they specifically considered the categories of information. The panel specifically said that those categories of information were known before, were monitored on electrical grids before. There was nothing... Electric power was about collecting information and then displaying it, not making an analysis based on particular information using a particular network. No, Your Honor. First, it was a network. It was a power grid network. The second was the claims identified the specific categories of information in very much the same as it did here. And what the panel said is merely identifying those categories of information, collecting data based upon them, analyzing them and reporting them, is an abstract idea. But in that case, the Court found that step one was a relatively easy analysis. It seems that you're skipping over step one. I'm not, Your Honor. Let me say two things and get to step two. I think the way the cases break down is that if you believe the claims are generic and general and describe collecting, analyzing, reporting data, it's an abstract idea. That's what they do. Step two, we're not skipping over to because the answer on step two is in figure six and in column 14, where the patent itself says that the implementation requires only customary and common computer components. So there's nothing in step two that could save the abstract idea. The real question, I think, going to Judge Stoll's question is, is this, does this fall into the category of collecting, analyzing, reporting data? The claim is very close to electric power. It is very much like this Court's decision in fair warning. If you contrast it with cases like EnFISH, FinGen, DDR, in every single one of those cases, it's a memory device, a new web page. There's not anything like that here. There's nothing that specific. Let me, in the interest of time... Before you sit down, I want to talk about willfulness. So I know that presupposes I might be disagreeing with you on 101, but the answer is I don't know that yet, but I want to look at some of the other issues that you've developed. And I'm happy to share that I was going to turn to the claim construction issue, but I'll... Yeah, let's look at willfulness. So you argue that the 2000 meeting is irrelevant and that they shouldn't even be bringing that up because at that point, you didn't have any knowledge of the patent, even if there was some discussion of the technology. Is that right? No, you're right. I think it's a little bit different. And what I would suggest on this issue is if you contrast what is in the brief with what is at A1160 to 1161, what was said at trial is that there was a meeting in 2000. It was to discuss the technology, but SRI decided not to disclose the technology at that time. And the words that were used by the witnesses is, we clammed up so we wouldn't tell them anything about the technology. Right. And there was no disclosure of the patent at that time. There was no... And that's why repeatedly at trial, SRI said that Cisco had been copied. The idea that something differently happened at this meeting now really is something that has come up on our field. So what is the earliest point in time in which there was evidence that Cisco was aware of the patent? Was it any time before 2012? Your Honor, I don't have that precise date, but I'll get it for you before I come up on the floor. 2012 is when they formally put you on notice. Right. But was there evidence that Cisco had notice of it before 2012? None that I believe that SRI relies upon. The focus is the 2000 meeting and thereafter. I know I've been into my rebuttal time. Let me just use 30 seconds of it to say something about the claim construction issue. I would like you to fully answer the question. Yeah. Did I fully answer the question? No. Okay. So on the willfulness issue, the other answer would be this. The focus of the district court's opinion is the fact that two Cisco engineers had not read the patent before their depositions. If that is the law, that two engineers... But did you ever argue to the court that there's no evidence that Cisco had noticed before 2012 and therefore willfulness dating all the way back and being weighted all the way back to 2000 would have been inappropriate? Yes, we did, Your Honor. Okay. And I'll find a reference for you before I come up with a rebuttal. Okay. Okay. Give us a minute or so. All right. One minute on the claim interpretation, which is also a very big issue. I mean, you have a repeated disclaimer. There's no dispute there's a disclaimer. SRI says there is. We say there is. The patent office says there is. The district court said there is. The question is the scope of the disclaimer. And the way I would do it in the time I have left is I can tee it up for you best this way. The disclaimer says no indirect examination is sufficient. It said no examination of information generated or gleaned is sufficient. It says no proxy is sufficient. The district court, which added the words data obtained and then clarified its claim reconstruction to say if the information has its source, if its lineage, if its origin is in data packets, that's sufficient. That abrogated entirely the disclaimer that was made repeatedly to the patent office. It is impossible, we suggest, to reconcile no indirect examination, not generated, not its origin, lineage, or source with the data packets. And I'll reserve my 30 seconds or so. We'll give you 30 seconds for rebuttal. Thank you. Mr. Schroepfendorf. Thank you. Good morning. May it please the court. I'll deal with the issues in the same order counsel did, if that's okay. First on 101, this is not at all like the sort of garden variety 101 cases where somebody says let's take a known process and just do it on the internet. It looks like detecting information, generating reports, and integrating the reports. It's just dealing with information by conventional means. So the claims actually are quite a bit more specific than that, Your Honor, and I think that's really where the analysis by Cisco has gone off the tracks here. Cisco concedes in reply that you... But do they add computer instrumentalities? Do they change the computer or is it simply different software? It is an improvement to the system itself, the software and system itself, in the selection of these network traffic categories. I mean that's really the core issue that cuts across, I think, several arguments that Cisco is making. Were the categories known per se? Yes. Had anyone selected these specific categories for this specific purpose? No. They contended. So it's clever, but it's still intellectual, isn't it? Well, it's not purely intellectual. It's ideas. It's choosing these particular parameters and writing them into the software. You have to... The insight was to recognize that looking at this particular kind of data in this particular way solved a problem that had not been solved before. Insight. Idea. Well, I guess, as the Court has said in many of its own opinions, if you abstract away enough of the detail of the claims, everything's abstract, right? But you can't do that. You actually have to look at what's in these claims. The Court's said it in McCrow and has said it in many other cases. And Cisco consistently doesn't do that. And in fact, the formulation you heard today is the fourth different formulation by Cisco of what the invention is. Today, it's collecting, analyzing, and reporting data. Well, that doesn't do justice to these claims. No, it's not. It's looking in a computer network security with a specific hierarchical arrangement of software and hardware. You're looking at specific data. You are creating reports based on the data you're looking at. You are then integrating and correlating those reports. These are very specific claims. And how would you describe the technical problem that is solved by the claimed invention? It is being able to detect intrusion in large-scale computer networks in a practical way, which had not been done before. It simply had not been. People had tried. Some of the prior art they cite, other than SRI's own prior art, the DID system was another attempt to try to do it. It was a prematurely academic system, never adopted in the real world, never worked. This research, these patents grew out of research funded by DARPA, the Defense Department, to solve this very problem, and they did. How do you explain the analogy that you gave to the jury? That certainly sounded pretty simple. Well, of course, we're not arguing 101 to the jury, right? I mean, it's an analogy to help them understand, by reference to something in their own experience, what we're talking about, to get them in the ballpark, as it were. But there was a lot more said to the jury than simply that high-level lead-in. We focused, indeed, on the network traffic categories. In particular, that argument was made to the jury not in the context of Emerald 97, because Cisco dropped that argument before the jury trial. But in the context of the other reference, the DID's reference, there was a lot of discussion about, did that reference monitor network traffic data at all, for any purpose? If it did, did it look at these specific kinds of network traffic data that are recited in the claims, because that is the key. That is the key to these claims. And if I can just comment on the other cases counsel has analogized to, electric power, very different case. In that case, somebody looked at the real world. How does somebody running a power grid, a person who's overseeing a power grid, sitting at a centralized location, what do they do? They look at certain kinds of data, and they collect them, and they put them on the screen, and then they try to figure out what to do. The patent, in that case, said, okay, let's take that and computerize it. So that was a classic case of taking something that had been done and known, but performed by humans previously, do it using computers. That's not this case. So it's your position this isn't even directed to an abstract idea? I'm sorry, directed? At step one, it's not even directed to an abstract idea? It's not. It's not. And that's what the district court found. I mean, you know, candidly, the district court said, and I think this picks up Judge Lori on your point, she said, look, at some level, if you state it abstractly enough, every patent that touches software could be described as involving abstract ideas. We all can sort of recognize that, but that can't be the analysis in step one. It has to be more than that. There has to be a looking at the claim and to see if there is something in the claim that pairs it down. And in this case, the court said, yes, there was. Just like DDR, where you had an improvement to the actual functioning of the computer and the computer network itself. Okay, so if I could go on to... Oh, I'm sorry. Can I ask you about willfulness? Unless you had something else you wanted to say about the one-on-one issue, I want to ask you about willfulness. Please. You know, in HALO, the court has made it clear that even if the test is more lenient now, you still have to show willful, wanton, culpable conduct. What is the evidence that would support the jury's verdict of willfulness? So, there's several things. First of all, this jury was instructed, of course, on the subjective prong of Seagate. This case was tried under Seagate. And they were specifically instructed on the subjective intent state of mind requirement. That's an A84. And they found, the jury found... I understand. I'm asking, what is the evidence that would support the jury's finding? Again, focusing on willful, wanton, culpable conduct. Right, okay. Not your regular infringement case. Okay, so let's go back to the question that Judge O'Malley asked about this meeting between Cisco and SRI. Cisco learns about SRI's technology, contacts SRI, and says, we want to come talk to you about your technology, set up a meeting. Okay? And there is a meeting. And SRI... But there was, I mean, on this point, your friend on the other side is correct, that there is actual evidence that SRI didn't want to disclose the technology and kept it close to the facts. Didn't want to disclose something very specific, okay? And I suggest if you look at the actual citations, and let me provide them, please. The meeting was set up because of Cisco's request to see the technology, that's at A5027, okay? And what was not shown to them was advanced high-level correlation, a very specific flavor of correlation, the integration and correlation step, because SRI had decided they were going to carve that out and save it for a startup company. But Cisco was shown a demonstration of the basic operation of the system. Well, how do you deal with the fact that you conceded at trial that they didn't copy? They didn't copy the patent claims. That concession, again, was very careful. The patent did not exist formally at the time of the meeting. Right. True. So what's the first point at which you put in evidence that they were aware of the patent? The soonest we know that they knew is when we told them in 2012. So then how can you have a willfulness determination that goes all the way back to 2012? Well, there are cases that say, I mean, this Court has recognized that if somebody sees in substance what later becomes the patented technology ahead of time and then later is found to have adopted the technology and used the technology, that's still relevant to willfulness even though the patent formally issues later. So this is one of those cases. But the other part of the willfulness equation, of course, is what did they... Did you even have a patent application pending in 2000? We did. And did you tell them that? I don't believe the record reflects one way or the other, to be honest, Your Honor, whether it was... whether there was a communication directly to Cisco that patents were pending. Well, that would have been a pretty important point to put in the record if it was accurate, right? I believe... I don't disagree with you. I just don't know whether the evidence existed one way or the other. We do know SRI published, excuse me, published publicly articles on their work as it was happening. That's actually how Emerald 97 came to be is because SRI had to report to the government, here's what we're doing, here's how we're spending your money, here's where we are. And indeed, it was Cisco reading that information that caused them to say, wow, this looks interesting, let's have a meeting about it. But how is that willful and wanton patent infringement? Well, as far as that goes, it isn't. But we know how the story played out. How the story played out is Cisco indeed did infringe. They had no evidence. They didn't bother to look at the patents. Their lawyers might have. We don't know. They didn't put in that evidence. But their key... You're saying the two engineers who testified when asked about it said that they had not seen the patents? They had not... Well, not only had not seen, I mean, that they thought correct, hadn't seen, hadn't looked at them. And indeed, Mr. Resch said, why would I do that? Patents are low information content. I got sued by SRI. I assumed SRI didn't know what they were talking about. He was contemptuous of the patents. I mean, it's hard to capture on a cold record how that testimony hit the jury. But this man showed up and said, I don't think these guys have any idea what they're talking about. Patents? Schmattens. I mean, he was very dismissive of the patents. You couple that with the fact that their infringement case was exceptionally weak. They went to trial on two arguments, one of which was contradicted the court's claim construction flat out. They don't even challenge that on appeal. The other contradicted their argument, their documents on correlation. There were dozens of Cisco documents that talked about how critical this correlation feature was to their system. Dozens. And their second marquee trial defense was, well, we don't do that. We don't correlate. And the district court saw all this and said, in essence, that's kind of ridiculous that you would put on those two defenses and they don't appeal either of those to you. Right? So that's so much for infringement. Now, on the validity side, they gave up 17 of 19 of their validity theories on the EVA trial. No obviousness defense. They go to trial on an anticipation defense on a reference that was litigated repeatedly in earlier litigation. They had no new argument. It was rejected in all of the re-exams. They had no new argument. And they don't appeal any of that to you either. Have we ever said since HALO that Greed versus Portec are the factors that you're to consider in determining whether enhancement under 284 is appropriate? You have. Let me give you a couple of case sites. They're in the papers. Georgetown Rail is one case. Georgetown Rail. Presidio Components. So at least those two cases explicitly reaffirm the viability of the Reed factors. The only case they cite to the contrary is Spectralytics. That case actually reaffirms the Reed factors as well in the page prior to the one that Cisco cites. It says, yes, Reed is alive and well. These are the factors we use. The only thing Spectralytics said was you might not weigh litigation misconduct as heavily in the enhancement scenario or context as you would for fees. But I don't think there's any question on this record that reads alive and well. All right. So let me just say finally a word about claim construction. I believe that's where the counsel ended up. And on that issue, was there a disclaimer? Yes, but not of what Cisco contends. And in fact, what they're contending, they use this phrase indirect examination. You're not going to find that phrase in the prosecution history. SRI never said any such thing. And in fact, even the examiner, fundamentally they're trying to rely on what the examiner said, which of course under this court's case law you can't do. I won't say it doesn't matter what the examiner said, but certainly that doesn't create a clear and unmistakable disclaimer by the patentee. But even the examiner never said, gee, if what you do is you take the actual network traffic packet and you take it apart so you figure out what you're going to actually look at. You take the header out, you get to just the data, then you reorder the data so it makes sense, so it's in the right order. If you analyze that, that's not what this patent's about. That was never discussed during re-examination. The examiner never said anything like that. Even if you take what the examiner... Can I ask you something? On page JA26402, I see a reference to indirect. I just want to ask you, I think this is the prosecution history. 26402? Yeah, it's 26402. It's in the last paragraph. And it says that the prior detects suspicious activity based upon indirect examination of network packets. And I think this is distinguishing the prior that was being relied upon by the examiner. So, I was wondering about your statement where you said the prosecution history doesn't use the word indirect. You're right. I meant SRI. It didn't say anything about indirect. This is the examiner referring to indirect. I apologize. That's fair. But what the examiner says about the claims and what they mean and how that matters, right? It is relevant insofar as it's some evidence of how somebody of skill in the art understands what transpired, yes. Particularly in response to the arguments that are being made by the patent applicant. Yes, fair enough. But then he goes on. And this is really where the rubber meets the road. Then he goes on on the same page to say even including direct examination of data gleaned from network packets. And so the examiner takes it and goes in a completely different direction and says even if what you're doing is looking at the data that's in the packets in some way that no one even knows I think how this could be done, that doesn't involve taking the packets apart first and organizing them first in a way that a computer can even process them, well even that's not covered. And so that's really what I think where it's not at all clear that there was a disclaimer and again at the end of the day and I know I'm running out of time here the patent examiner was distinguishing this intrusive activity article. This goes over to the next page. Intrusive activity. All this discussion is about that reference, okay? That reference had nothing to do with pre-processing network traffic data. It was about analyzing higher level complex abstract objects that were inferred, that's the examiner's word, inferred from what was going on with the network packets. So very different process very different approach to the problem and that's something actually Cisco even claims that it does. Thank you Mr. Schreckenbach. Mr. Lee has a couple of minutes to rebuttal if he needs it. Very briefly, Your Honor. To answer Judge O'Malley's question, the date would be May 8, 2012 at Appendix 5001 to 5002 I think is the first notice. I think we both agree on that. Could you say Appendix 5001? 5001 to 5002 It's the notice letter. Let me make two points and pick up where Mr. Schreckenbach ended. It's more than the examiner saying indirect. If Your Honor looks at 26286 SRI articulates the examiner's position that indirect examination would be covered and then spends two pages debunking in its view that idea concluding at the end of 26287 that the examiner's logic that indirect examination would be covered is flawed. It said it four times. It four times characterized it said the examiner said it would cover indirect examination and they four times said the logic is flawed. That's why when I try to do it quickly, the idea that the claims don't cover indirect examination don't cover generated or gleaned, don't cover proxy cannot be reconciled with the clarification order that refers to source origin and lineage in either context and Mr. Schreckenbach's statement about intrusive is actually incorrect I would say respectfully. If the court considers intrusive at A33841 you will see that it's not limited in the manner in which SI argued in its brief that the disclaimer is limited to logs the intrusive article covers more than logs that covers other forms and it's described specifically at those pages. So their interpretation at least in the briefs to you of the disclaimer as limited to logs would not have covered intrusive. Last point, on the question of section 101 what I would say and leave the panel with is this if you compare this claim claim 1 to the claims of electric power and fair warning, those claims have more information than this claim does in fact if you take this claim and you eliminate the categories of begin the argument with, what you're left with is a computer automated method, that's how it begins that collects information generates information integrates it and reports it with nothing else. Under this court's decision that is not patent eligible subject matter. Thank you, Your Honor. Thank you, Mr. Lee. We'll take the case on revisal.